J-A07036-24

2024 PA Super 109

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
: PENNSYLVANIA
:
v. :
:
:
:
THOMAS ANDREW DEWALD :
:
Appellant : No. 199 MDA 2023

Appeal from the Judgment of Sentence Entered August 17, 2022
In the Court of Common Pleas of Franklin County Criminal Division at
No(s): CP-28-CR-0000849-2019

BEFORE: STABILE, J., SULLIVAN, J., and STEVENS, P.J.E.[*]

OPINION BY STEVENS, P.J.E.: **FILED: MAY 30, 2024**

Appellant, Thomas Andrew Dewald, appeals from the judgment of sentence entered in the Court of Common Pleas of Franklin County after a jury convicted him of one count of Kidnapping, five counts of Attempted Kidnapping, two counts of Burglary, two counts of Criminal Trespass, one count of Unlawful Restraint, one count of False Imprisonment, and one count of Recklessly Endangering Another Person. Receiving an aggregate sentence of 32 to 65 years' incarceration, Appellant raises multiple issues challenging his conviction and sentence. After careful review, we affirm.

The trial court's Pa.R.A.P. 1925(a) opinion sets forth the relevant facts of this appeal as follows:

> During the early morning hours of April 25, 2019,
> [Appellant] entered a residence located on the 12000 block of Pen

_____

[*] Former Justice specially assigned to the Superior Court.

Mar Road in Washington Township, Franklin County, Pennsylvania and abducted the minor child G.M. who was four years old at the time. The [Appellant] removed G.M. from the house on Pen Mar Road and took her to his grandparents' residence on Harbaugh Church Road, also in Washington Township, where he had been staying. After several hours, [Appellant] bound G.M. in duct tape and placed her in a wooden box located in his bedroom. The [Appellant] then went to work.

After G.M. was reported missing, an extensive search effort including law enforcement, emergency personnel and other first responders and residents ensued. A local resident participating in the search found G.M. later on April 25, 2019 along Harbaugh Church Road near [Appellant]'s Grandparents' residence. Thereafter, search and canvasing efforts led by the Chambersburg Barracks of the Pennsylvania State Police focused on finding G.M.'s abductor.

Despite her young age, the child was able to supply investigators with several statements useful in their search for the perpetrator. The child indicated that she had been taken from her bedroom by a man who referred to himself as "Tom" and that she was duct-taped and kept inside a wooden chest in a "red brick house," from which she was able to escape.

On April 25, 2019, G.M. underwent a forensic interview at the Over the Rainbow Child Advocacy Center (hereinafter referred to as "CAC") with Rebecca Voss, a forensic interviewer. During this interview, G.M. told Rebecca Voss about being placed in a toy chest or chest, being taped on the mouth and/or wrists, and that "Tom" was the person who had abducted her and done these things to her.  The CAC interview was audio and video recorded.

In the early morning hours of April 28, 2019, [Appellant] entered a residence located on the 14000 block of Lower Edgemont Road in Washington Township.  After looking around for the three minor children that lived in the residence, ages three, six and eight, [Appellant] left after being scared off by the family dog who apparently alerted and growled and barked in an uncharacteristically aggressive manner. Thomas Lambert, homeowner of the Lower Edgemont Road residence woke up to the dog barking and growling, heard noises and footsteps in the second-floor hallway and stairwell. Lambert ran downstairs where he observed his front door and screen door ajar and a window with

no screen open. Lambert then secured his family and called the police and reported the incident.

Using information gathered in the investigation, members of the Pennsylvania State Police obtained a search warrant for [Appellant]'s grandparents' home. Upon executing that warrant, on April 29, 2019, troopers and investigators were able to obtain several pieces of physical evidence. Nearing the end of the search of [Appellant]'s grandparents' home, members of the Pennsylvania State Police encountered [Appellant] outside the home as he returned from work. After a brief interview and the collection of some evidence, [Appellant] was transported to the Pennsylvania State Police Chambersburg Barracks. There, during an interview with Pennsylvania State Police members [Appellant] confessed to the break in Pen Mar Road and the abduction of G.M. as well as the break in on Lower Edgemont Road with the intention to abduct children living in that residence. [Appellant] supplied specific details to both criminal events during this interview. [Appellant] was later charged with multiple offenses including burglary, kidnapping, attempted kidnapping, trespass, reckless endangerment and unlawful restraint.

On February 25, 2020, the Commonwealth filed a tender years motion and motion for closed-circuit testimony. After several delays occasioned by successive motions of appointed counsel for the [Appellant] to withdraw, as well as the judicial emergency brought on by the COVID-19 pandemic, on October 19, 2020, we held an evidentiary hearing on these motions. On November 3, 2020, we issued an Opinion and Order granting the Commonwealth's tender years motion and motion for closed-circuit testimony.

On January 4, 2021, [Appellant] filed a motion for change of venue, citing the widespread media coverage of the kidnapping and ensuing search for G.M. and manhunt for the [Appellant]. [Appellant] averred that due to the media attention, insufficient jurors could be found in Franklin County who had not already formed a fixed opinion about the [Appellant] and his guilt with regard to the crimes charged to allow for a fair trial. We determined that we could not consider [Appellant]'s motion to change venue without an opportunity to assess a jury pool and determined whether a sufficient number of jurors without a fixed opinion could be empaneled. On Monday, May 16, 2022, we conducted jury selection, and through the *voir dire* process and

questioning of jurors at side-bar, we empaneled sixteen (16) members of the pool as a jury of twelve (12) with four (4) alternates. At the conclusion of jury selection on May 16, 2022, we denied [Appellant]'s venue motion by dictated Order of Court.

On July 14, 2021, [Appellant] timely filed an omnibus pretrial motion seeking to suppress his confessions at his grandparents' residence as well as at the Chambersburg State Police Barracks. After several continuances, hearing was held on this motion on November 4, 2021 and February 21, 2022. We ordered the parties to file briefs outlining their respective positions in light of the evidence adduced at hearing. On April 20, 2022, we issued an Opinion and Order denying [Appellant]'s motion to suppress his confessions.

This matter was tried before a jury on May 16, 2022 through May 20, 2022. On May 20, 2022, the jury returned verdicts of guilty on the following counts/offenses: Count 1, Kidnapping[fn 1] (Fl); Counts 2-6, (F1) Criminal Attempt-Kidnapping[fn2] 2; Counts 7-8, Burglary[fn3] (F1); Count 9, False Imprisonment[fn4] (172); Count 10, Unlawful Restraint[fn5] (F2); Counts 11-12, Criminal Trespass[fn6] (F2); Count 15, Recklessly Endangering Another Person[fn7] (M2). The Court sentenced the [Appellant] on August 17, 2022 as follows:

---

1 18 Pa.C.S.§ 2901(a.1)(3)
2 18 Pa.C.S.§ 2901(a.1)(3)
3 18 Pa.C.S.§ 3502 (a)(1)(i)
4 18 Pa.C.S.§ 2903 (b)
s 18 Pa.C.S.§ 2902 (a)(1)
6 18 Pa.C.S.§ 3503 (a)(1)(ii)
7 18 Pa.C.S.§ 2705.

---

c. Count 4, CA Kidnapping-42-84 months;
d. Counts 7-8, Burglary 54-108 months 8;
e. Count 9, False Imprisonment 27-54 months;
f. Count 10, Unlawful Restraint- 27-54 months;
g. Count 15, REAP- 9-24 months.

The aggregate sentence imposed is 32 years, 3 months to 65 years.

[Appellant] timely filed Amended Post Sentence Motions on September 6, 2022, and set a date for hearing. Upon motion of the [Appellant] we generally continued the hearing and proceeded on a briefing schedule. By Opinion and Order dated January 4, 2023, the trial court denied [Appellant]'s post sentence motions. This timely appeal followed.

Trial Court 1925(a) Opinion, 1-5.

On Appeal, Appellant raises the following issues:

1. Did the trial court err by not suppressing Dewald's statements to the Pennsylvania State Police that were audio recorded at his home and audio/video recorded at the Pennsylvania State Police Barracks in violation of Miranda v. Arizona and its progeny?

2. Did the trial court err by admitting Dewald's inculpatory statements relating to Counts 4-6 Criminal Attempt Kidnapping and County 8 Burglary as it violated the Corpus Delicti rule and does not meet the closely related crime exception?

3. Did the trial court err by sentencing Dewald for Count 9 False Imprisonment and County 10 Unlawful Restraint rather than merging those counts into Count 1 Kidnapping?

4. Did the trial court err by sentencing Dewald for Count 15 Recklessly Endangering Another Person rather than merging the sentence into Count 10 Unlawful Restraint?

5. Did the trial court abuse its discretion by admitting evidence related to Dewald's hand-written journals as the unfair prejudice of admitting the journals outweighed the probative value?

6. Did the trial court abuse its discretion by denying Dewald's Motion for Change of Venue, particularly considering no evidentiary hearing occurred prior to ruling?

7. Was the evidence presented by the Commonwealth insufficient to sustain the verdicts on the following:

> i) Counts 4-6 Criminal Attempt Kidnapping, and Count 8 Burglary
>
> ii) Count 10 Unlawful Restraint and
>
> iii) Count 15 Recklessly Endangering Another Person?
>
> 8. Did the trial court abuse its discretion by finding that the verdicts reached by the jury were not against the weight of the evidence on the following:
>
> > i) Count 2 Criminal Attempt Kidnapping,
> >
> > ii) Counts 4-6 Criminal Attempt Kidnapping,
> >
> > iii) Count 10 Unlawful Restraint and
> >
> > iv) Count 15 Recklessly Endangering Another Person?

Brief for Appellant, at 12-13.

In Appellant's first issue, he challenges the trial court's order denying his motion to suppress all pre-Mirandized and post-Mirandized statements he made to state troopers during their encounter with him beginning at his residence and continuing to the police station. Contested in his motion, and argued here on appeal, is what he describes as the troopers' use of an unconstitutional, two-step interrogation strategy whereby they initially created at his residence the pretense of an optional, voluntary interrogation unaccompanied by **Miranda** warnings and, once they obtained incriminating answers to calculated investigatory questions asked in a subtly pressured environment, paused momentarily before Mirandizing him for the first time and taking him to the police station where he repeated the incriminating statements already given. **See**, **e.g.**, **Commonwealth v. Underkoffler**, 309

A.3d 1047 (non-precedential decision) (Pa. Super. filed November 14, 2023) (discussing the two-step interrogation practice).[1,2] Appellant concedes that "if [he] was not in custody [during his front-yard encounter with Sergeant Martin], then his statements could not have been made during a custodial

---

[1] We note that, pursuant to Pa.R.A.P. 126(b), unpublished non-precedential decisions of the Superior Court filed after May 1, 2019, may be cited for their persuasive value. We find guidance in the unpublished memorandum cited *supra* and find it to be persuasive in this matter.

[2] **Underkoffler** provides the following salient discussion of jurisprudence on two-step interrogations:

> The Supreme Court of the United States first faced the dilemma of two-step interrogations in **Oregon v. Elstad**, 470 U.S. 298 (1985). That case involved an officer who casually elicited a single, inculpatory statement from a teenage suspect, prior to the **Miranda** warnings, while the suspect sat in his living room and police explained the situation to his mother. After taking the teenager to the station and reading the **Miranda** warnings to him, the officers obtained a full confession. The **Elstad** Court determined that the trial court properly admitted the post-warnings confession into evidence.
>
> The High Court said, "absent deliberately coercive or improper tactics in obtaining the initial statement, the mere fact that a suspect has made an unwarned admission does not warrant a presumption of compulsion" with respect to the second statement. **Id.** at 314. "The relevant inquiry is whether, in fact, the second statement was also voluntarily made" and, "[a]s in any such inquiry, the finder of fact must examine the surrounding circumstances and the entire course of police conduct with respect to the suspect in evaluating the voluntariness of his statements." **Id.** at 318. The Supreme Court held that the "subsequent administration of **Miranda** warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded admission of the earlier statement." **Id.** at 314.

**Underkoffler**, 309 A.3d 1047, at **9-10.

interrogation, and thus would be classified as gratuitous." Brief of Appellant, at 28-29. He contends, however, that because he was in custody at this time, the withholding of **Miranda** warnings during what he insists was a custodial interrogation required suppression of all his inculpatory statements and subsequent post-**Miranda** confession. We disagree.

Our court has recently set forth the pertinent standard of review, as follows:

> [Our] standard of review in addressing a challenge to the denial of a suppression motion is limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Because the Commonwealth prevailed before the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the suppression court's factual findings are supported by the record, [the appellate court is] bound by [those] findings and may reverse only if the court's legal conclusions are erroneous.

> **Commonwealth v. Jones**, 121 A.3d 524, 526 (Pa. Super. 2015) (citation omitted; brackets in original), **appeal denied**, 135 A.3d 584 (Pa. 2016). Additionally, "[i]t is within the suppression court's sole province as factfinder to pass on the credibility of witnesses and the weight to be given to their testimony. The suppression court is free to believe all, some or none of the evidence presented at the suppression hearing." **Commonwealth v. Byrd**, 185 A.3d 1015, 1019 (Pa. Super. 2018) (citation omitted).

> It is well settled that when an individual is "both taken into custody and subjected to interrogation," that individual is entitled to **Miranda** warnings. **Commonwealth v. Yandamuri**, 159 A.3d 503, 520 (Pa. 2017). Specifically, our Supreme Court has explained:

The United States Supreme Court has held that, before law enforcement officers question an individual who has been in taken into custody or has been deprived of his freedom in any significant way, the officers must first warn the individual that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed. However, these special procedural safeguards are required only where a suspect is both taken into custody and subjected to interrogation.

In determining whether a suspect is in custody, two discrete inquiries are essential: (1) an examination of the circumstances surrounding the interrogation; and (2) a determination of whether, given those circumstances, would a reasonable person have felt that he or she was at liberty to terminate the interrogation and leave. As noted, a person is in custody for *Miranda* purposes only when he is physically denied his freedom of action in any significant way or is placed in a situation in which he reasonably believes that his freedom of action or movement is restricted by the interrogation. … Whether an encounter is deemed "custodial" must be determined by examining the totality of the circumstances.

*Id.* at 520-521 (citations omitted).

*Commonwealth v. Ganjeh*, 300 A.3d 1082, 1088–89 (Pa. Super. 2023), *appeal denied*, No. 468 MAL 2023, 2024 WL 614041 (Pa. Feb. 14, 2024). "The fact that a police investigation has focused on a particular individual does **not** automatically trigger 'custody,' thus requiring *Miranda* warnings." *Commonwealth v. Mannion*, 725 A.2d 196, 200 (Pa. Super. 1999) (emphasis in original) (citing [*Commonwealth v. Fento*, 526 A.2d 784, 787 (Pa. Super 1987)]).

- 9 -

At the hearing on Appellant's motion to suppress both his statements and evidence flowing from such statements, Pennsylvania State Police Sergeant Aaron Martin[3] testified that on April 29, 2019, during daylight hours at approximately 6:25 p.m., Appellant arrived at his residence—a rural, single family, detached brick ranch-style home where he lives with his grandparents—and parked his vehicle next to his grandparent's car on a gravelly area located to the left of the home. N.T. at 18, 20-21. Neither family vehicle was obstructed during the police-citizen encounter. N.T. at 22. At the far-right side of the front yard were two state troopers—the sergeant and Pennsylvania State Trooper Hull—in plainclothes standing next to an unmarked police vehicle parked on the driveway serving the attached garage at the right end of the home. N.T. at 23-24.

According to Sergeant Martin, Appellant exited his vehicle and was walking the approximately 40-yard distance across the front yard directly towards the troopers when the sergeant asked if he could speak to Appellant for a minute. N.T. at 25, 56. Notably, the sergeant indicated Appellant's pathway to the center front door of the home was unobstructed, but Appellant walked straight towards the troopers the entire time. N.T. at 23. Introductions were made, and the sergeant engaged Appellant in what he described as the same casual conversation that he had with numerous other

_____

[3] On the day in question, Sergeant Martin maintained the rank of Corporal. N.T. at 25. He attained the rank of Sergeant subsequently. This decision, however, will refer to him as Sergeant Martin.

people in the preceding days regarding the mass effort to canvas the area in response to the kidnapping of G.M. N.T. at 25-26. He asked Appellant if he knew G.M.'s family and if he was aware of the kidnapping, and Appellant denied knowing the family but claimed that his grandmother had told him about the incident. N.T. at 26.

Sergeant Martin replied that he was at Appellant's residence as "a matter of practice", part of a door-to-door search throughout the community, but then he informed Appellant that the state police just completed a search of his residence and discovered "some things inside the residence that I found interesting[.]" N.T. at 26, 48. He followed this news by asking Appellant, "[D]o you mind if we look at your vehicle and if would you [sic] mind giving me a sample of Buccal swab which is a DNA collection kit?" N.T. at 26. The sergeant testified that Appellant did not seem concerned and agreed to both requests. N.T. at 26, 33.

When told that two other troopers who had been at a neighbor's home would handle the paperwork for the search, Appellant walked back to his car to meet the troopers and fill the "Waiver of Rights and Consent to Search" form for a vehicle search seeking things such as tape, hair fibers, and masks. N.T. at 27, 29. Afterward, he walked back to Sergeant Martin, who explained the Buccal swab consent form, which Appellant then signed. N.T. at 27.

According to Sergeant Martin's testimony, at no time during this encounter did any law enforcement officer shout at Appellant, place him in a vehicle, handcuff him, or impede or redirect his movements. N.T. at 27-28.

"There was no one between him and his residence. His front door was open. I mean, we were positioned – my position was even down towards the driveway and that he was more towards his own residence." N.T. at 28. "He could have walked right inside his residence if he choose [sic] to", the sergeant maintained. N.T. at 56.[4] When asked if Appellant was free to get in his car and leave, the sergeant answered that he could have. N.T. at 56, 57. Asked if Appellant was ever ordered during the time in question, the sergeant answered, "No." N.T. at 28.

From the initial encounter at the driveway to the time Appellant agreed to the searches, "[j]ust a couple minutes" transpired. N.T. at 30. Including the subsequent time of processing of the consent forms and performing the Buccal swab, less than ten minutes transpired. N.T. at 37. At that point, Appellant granted the sergeant's request to have a one-to-one recorded conversation while standing outside on the driveway. N.T. at 30. The only other person nearby was Trooper Hull. N.T. at 63. Appellant's grandparents were inside the home. N.T. at 63-64. The recorded conversation lasted approximately 26 minutes. N.T. at 40.

Sergeant Martin did not consider Appellant to be in custody during the events described. N.T. at 30. It was his understanding that one need not be under arrest or in handcuffs to be in custody. N.T. at 62. "[Appellant] could

---

[4] Pennsylvania State Trooper Lucas Hull agreed that Appellant could have walked in his home if he so chose. N.T. at 74-75. Appellant never indicated that he wished the interview to stop. N.T. at 76-77.

have walked in his home as soon as he got out of his car. He could have turned and walked away from me at any time. Walked up into his home", the sergeant testified. N.T. at 34. Also militating against the existence of a custodial setting, the sergeant believed, was that it was well-known at the time that many law enforcement officers were canvassing the public and conducting investigations into what had happened to G.M. N.T. at 36. He noted there was a much larger presence of law enforcement in that general area than usual. N.T. at 36.[5]

Sergeant Martin described the one-to-one conversation with Appellant as a "very cordial, two-way conversation. He was very agreeable and he never seemed combative or reluctant in any way." N.T. at 37. It was "just very easygoing conversation. I believe it is recorded." N.T. at 35.

It was his opinion that the encounter became custodial only after Appellant made several admissions during their recorded conversation. N.T. at 32. At that point, the sergeant advised Appellant he was under arrest, handcuffed him, and placed him in the vehicle, where he read him his *Miranda* rights. N.T. at 32.

On cross-examination, defense counsel explored the recorded conversation between Sergeant Martin and Appellant. N.T. at 59. Specifically, the sergeant agreed that Appellant denied having any involvement with G.M.'s

---

[5] Trooper Hull testified that the state troopers "had interviewed multiple houses in that location, I would say 50 to 60 houses, and interviews were complete at each residence." N.T. at 78.

- 13 -

abduction or knowledge of either the case or G.M.'s family. N.T. at 59. Eventually, the sergeant confronted Appellant and said, "Tom, I think you had something to do with this", and Appellant agreed. N.T. at 60.

On redirect, Sergeant Martin denied employing a two-tier strategy approach. N.T. at 67. His approach was to have a conversation, consider the information it offers, and then determine whether to accept it or question it. N.T. at 67. He distinguished what he did from interview strategies in which officers "would lean on people absent *Miranda*" to elicit information and then use that information in a post-*Miranda* interrogation to get a confession. N.T. at 68. His training admonishes against using this strategy. N.T. at 68. Nevertheless, on re-cross, he agreed that he sought to elicit incriminating statements from Appellant when he initially interviewed him. N.T. at 71.

As discussed above, our inquiry is guided by whether a reasonable person in Appellant's position would have believed they were in custody at the time they made their statement to law enforcement. At the conclusion of the suppression hearing, the trial court determined as finder of fact that Sergeant Martin testified credibly that he maintained an open, permissive environment in the front yard, talked to Appellant calmly and politely, and used requests rather than demands throughout the encounter on Appellant's lawn.

While the record supports the conclusion that Sergeant Martin's conversation with Appellant quickly evolved into an interrogation, it also establishes that Appellant's participation in the interrogation was not coerced. Contributing to the reasonable impression that Appellant was not in custody

were the troopers' deferential physical cues of standing on the far side of the front yard and allowing Appellant to walk freely about and into his home if he so chose, but Appellant elected to walk directly to Sergeant Martin and Trooper Hull rather than towards the home's front door prior to being addressed by the plainclothed sergeant. Furthermore, once the voluntary conversation and questioning ensued, Sergeant Martin informed Appellant in a polite, conversational tone that the Pennsylvania State Police were canvassing the area regarding the well-publicized abduction of G.M., a fact which further would have suggested to a reasonable person in Appellant's position that he was not being singled out for arrest or being restrained to any such degree. Thus, Appellant was not only free at the outset to walk directly into his home and decline Sergeant Martin's invitation to talk, he also possessed information that indicated he was free to refuse taking any more questions.

There were countervailing moments, however, that would have implied to the reasonable person in Appellant's position that he might be the focus of an investigation. Sergeant Martin informed Appellant that his grandmother allowed them to enter the home and look around, and he offered the vague but ominous statement that they had seen "interesting things" inside. The sergeant also followed that statement by asking Appellant if he would mind consenting to a vehicle search and a buccal swab for DNA. After Appellant completed both, the sergeant asked him if he would agree to a recorded conversation, and Appellant agreed. A 20-plus minute conversation ensued

and concluded with Appellant's Pre-**Miranda** warnings inculpatory statements.

Nevertheless, on balance, we agree with the trial court that Appellant was not "in custody" at the time he made his pre-warnings statements, as neither his freedom of action nor his ability to decline the sergeant's requests had been deprived or curtailed in any significant way. In addition, Appellant directs us to no coercive questions or statements put to him during the 20-plus minute recorded interview between Trooper Martin and Appellant. As such, with reference to the above-cited relevant authority, we reject Appellant's contention that the state police conducted an unlawful two-step interrogation in which his initial inculpatory statements were obtained during a custodial interrogation.

Appellant's second issue challenges the trial court's evidentiary ruling overruling his *corpus delicti* objection to the Commonwealth's introduction of his extra-judicial inculpatory statements in which he took responsibility for the burglary and three attempted kidnappings at a Lower Edgemont Road residence on April 28, 2019, just several miles away from G.M.'s home and three days after the kidnapping and subsequent discovery of G.M. According to Appellant, the only admissible, relevant evidence of the alleged crimes were Appellant's statements. This is so, he maintains, because the homeowner's testimony of being awakened by his dog's unusual growling, hearing a noise in the hallway and stairway of his home, and discovering upon going downstairs that his front door was ajar and a nearby window open failed to

establish the *corpus delicti* of a burglary and attempted kidnapping by a preponderance of the evidence. Brief of Appellant at 35. Specifically, he argues that such testimony did not, by a preponderance of the evidence, place an uninvited person in the home as opposed to, say, one of the homeowner's children being responsible for the disturbances. Nor did the evidence establish the requisite intent to commit a burglary or kidnapping by a preponderance of the evidence, he posits.

Our standard of review for a challenge pursuant to the *corpus delicti* rule is well-settled.

> The *corpus delicti* rule is designed to guard against the hasty and unguarded character which is often attached to confessions and admissions and the consequent danger of a conviction where no crime has in fact been committed. The *corpus delicti* rule is a rule of evidence. Our standard of review on appeals challenging an evidentiary ruling of the trial court is limited to a determination of whether the trial court abused its discretion. The *corpus delicti* rule places the burden on the prosecution to establish that a crime has [ ] occurred before a confession or admission of the accused connecting him to the crime can be admitted. The *corpus delicti* is literally the body of the crime; it consists of proof that a loss or injury has occurred [because] of the criminal conduct of someone. The criminal responsibility of the accused for the loss or injury is not a component of the rule .... The *corpus delicti* may be established by circumstantial evidence. Establishing the *corpus delicti* in Pennsylvania is a two-step process. The first step concerns the trial judge's admission of the accused's statements[,] and the second step concerns the fact finder's consideration of those statements. [F]or the statement to be admitted, the Commonwealth must prove the *corpus delicti* by a preponderance of the evidence. [F]or the statement to be considered by the fact finder, the Commonwealth must establish the *corpus delicti* beyond a reasonable doubt.

***Commonwealth v. Hernandez***, 39 A.3d 406, 410–11 (Pa. Super. 2012)

(quotation marks and citation omitted; emphases omitted).

> the *corpus delicti* rule should not be viewed as a condition precedent to the admissibility of the statements or confessions of the accused. ***Id.*** at 274, n. 41. Rather, the rule seeks to ensure that the Commonwealth has established the occurrence of a crime before introducing the statements or confessions of the accused to demonstrate that the accused committed the crime. The rule was adopted "[t]o avoid the injustice of a conviction where no crime exists.... The fact that a crime has been committed by someone must be shown before a confession will be received." ***Commonwealth v. Leslie***, 424 Pa. 331, 227 A.2d 900, 904 (1967) (internal citations omitted) (a minor defendant confessed to having committed arson, but the Fire Marshal could not support his suspicion that the fire was of an incendiary origin; accordingly, this Court overturned the conviction).

***Commonwealth v. Taylor***, 831 A.2d 587, 590–91 (Pa.2003).

In addition, an exception to the rule of *corpus delicti* exists, which is commonly referred to as the "closely related crimes exception." Pursuant to this exception, inculpatory statements may be admissible as to all crimes charged even though the Commonwealth's independent evidence is able to establish the *corpus delicti* of only one. For the exception to apply, the relationship between the crimes charged must be sufficiently close [to] ensure that the purpose underlying the *corpus delicti* rule is not violated.

> The purpose behind the *corpus delicti* rule is the ultimate consideration in determining whether two crimes are closely related [to] implicate the exception. Where the relationship between the crimes to which the defendant has confessed is close and the policy underlying the *corpus delicti* rule—to avoid convictions for crimes that did not occur—is not violated, the exception renders the confession admissible for all closely related crimes. [***Commonwealth v. Taylor***, 831 A.2d 587,] 595-96 [(Pa. 2003)]. Thus, where the Commonwealth establishes the

> *corpus delicti* of one crime, an appellant's inculpatory statements may be admissible as evidence for all crimes which are closely related. Whether the crimes are sufficiently close to justify invoking the exception must be determined on a case[-]by[-]case basis. **Id.** at 593.

**Commonwealth v. Herb**, 852 A.2d 356, 363-64 (Pa. Super. 2004) (citations and emphasis omitted). With respect to the determination of whether the crimes are closely related, the fact the offenses may be different grades is inconsequential. **See Commonwealth v. Verticelli**, 706 A.2d 820, 825-26 (Pa. 1998), **abrogated on other grounds by Taylor**, **supra**.

Here, while there was no eyewitness to Appellant's uninvited entry into the home and procession to the second floor, the homeowner testified to hearing not only the uncharacteristic growling of his dog but also the sound of someone running down the staircase immediately afterward. Furthermore, when the homeowner went downstairs to investigate, he saw that both a window and the front door and its screen door that had been closed when he went to bed were now open. This totality of evidence sufficed to prove that the homeowner not only observed circumstantial evidence of an unlawful, uninvited nighttime entry into his home but also heard an intruder who either had been on the second floor or was making his way up the stairs when he was forced to leave prematurely.

Therefore, we conclude this evidence supplied the *corpus delicti* of the crimes of burglary and kidnapping to which Appellant confessed committing. Even assuming arguendo that the evidence substantiated the *corpus delicti* of Appellant's burglary alone, we would find the closely related crimes exception

applied to admit Appellant's confession to entering the home with the intent to kidnap the children who lived there, as evidence that he used the staircase leading to the bedrooms during his burglary established a close relationship between the burglary and attempted kidnapping occurring at the same time and place. The Commonwealth's evidentiary proffer in this regard, therefore, allayed any concern that Appellant would be convicted for criminal conduct based merely on an unsubstantiated confession.

The next issue we address is Appellant's contention that the Commonwealth failed to produce sufficient evidence of each element of the crimes of attempted kidnapping and burglary at the Lower Edgemont Road residence as it could only prove Appellant's involvement through his own statements, which violated the *corpus delicti* rule. As raised and developed, however, Appellant's ostensible sufficiency claim is merely a repackaging of his failed challenge to the trial court's evidentiary ruling deeming admissible his incriminating statements pertaining to his entry into the residence without separate evidence of the subject crimes to undergird the confession.

We already have determined that additional relevant and admissible evidence of Appellant's criminal entry and intent consisted of the homeowner's testimony describing how he heard a nighttime intruder run down his stairs immediately after his dog growled uncharacteristically and how he then observed upon investigation that his front door, screen door, and window had been opened. This additional evidence substantiated Appellant's confession that he had entered his home on the same night and had drawn close to the

children's bedrooms before being turned away by the family dog, such that the testimony, coupled with evidence of Appellant's confession, provided sufficient evidence of the burglary and attempted kidnapping. Because Appellant otherwise develops no argument to support this sufficiency of the evidence claim, it affords him no relief.

In the alternative to his sufficiency argument on his attempted kidnapping and burglary convictions, Appellant advances a weight of the evidence challenge in which he claims the homeowner's testimony that Appellant had left the home before the homeowner could see him supported his defense that he had renounced his decision to abduct the children.[6] Further support for this renunciation defense, he contends, was his statement during his post-arrest interview with Sergeant Martin that once he had entered the East Langmore Road household and saw what he considered to be a "normal family", he decided he would "leave this one alone" and had started to leave the home before the dog growled, which, he said, caused him to run out. PSP Recorded Interview of Appellant, Exhibit 569.

Our standard of review for a claim that the verdict was against the weight of the evidence is as follows:

> A motion for a new trial based on a claim that the verdict is against the weight of the evidence is addressed to the discretion of the trial court. A new trial should not be granted because of a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion. Rather, the role of

---

[6] This weight of the evidence claim appears in Argument H(ii), beginning on page 60 of the Brief of Appellant.

the trial judge is to determine that notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice. It has often been stated that a new trial should be awarded when the jury's verdict is so contrary to the evidence as to shock one's sense of justice and the award of a new trial is imperative so that right may be given another opportunity to prevail.

An appellate court's standard of review when presented with a weight of the evidence claim is distinct from the standard of review applied by the trial court:

> Appellate review of a weight claim is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence. Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence. One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice.

*Commonwealth v. Sebolka*, 205 A.3d 329, 340–341 (Pa. Super. 2019) (citations and internal quotation marks omitted).

As discussed *supra*, the homeowner testified that he heard footsteps running down the stairs only after hearing his dog's growling, evidence which, if believed by the jury, would support a conclusion that Appellant had not voluntarily renounced his plan to kidnap the children but, instead, had no choice but to flee from the home to avoid being attacked by the dog or otherwise discovered by the homeowner investigating the dog's alarming growl at 3:00 a.m. In assessing this issue in the post-trial phase, the trial

court reasonably found that the jury's verdict on counts 4, 5, and 6 for attempted kidnapping of the three children residing at the East Langmore Road household was not against the weight of the evidence. We discern no error with the trial court's determination.

Appellant next asserts that his convictions for Count 10 Unlawful Restraint and Count 15 Recklessly Endangering Another Person relating to G.M. either went unsupported by sufficient evidence or went against the weight of the evidence relating to whether he placed G.M. at risk of serious bodily injury or death during the abduction. We disagree.

Our standard of review of a challenge to the sufficiency of the evidence is well-established:

> [O]ur applicable standard of review is "whether the evidence admitted at trial, and all reasonable inferences drawn from that evidence, when viewed in the light most favorable to the Commonwealth as verdict[-]winner, was sufficient to enable the fact[-]finder to conclude that the Commonwealth established all of the elements of the offense beyond a reasonable doubt." *Commonwealth v. Eichinger,* 915 A.2d 1122, 1130 (Pa. 2007). Additionally, when examining sufficiency issues, "we bear in mind that: the Commonwealth's burden may be sustained by means of wholly circumstantial evidence; the entire trial record is evaluated and all evidence received against the defendant considered; and the trier of fact is free to believe all, part, or none of the evidence when evaluating witness credibility." *Commonwealth v. Markman,* 916 A.2d 586, 598 (Pa.2007).

*Commonwealth v. Crabill,* 926 A.2d 488, 490–91 (Pa. Super. 2007) (citations modified). "This standard is equally applicable to cases where the evidence is circumstantial rather than direct so long as the combination of the evidence links the accused to the crime beyond a reasonable doubt."

*Commonwealth v. Brunson*, 938 A.2d 1057, 1058 (Pa. Super. 2007) "Although a conviction must be based on 'more than mere suspicion or conjecture, the Commonwealth need not establish guilt to a mathematical certainty.'" *Id.* (internal citation omitted).

"[A] person commits [the offense of unlawful restraint] if he knowingly ... restrains another unlawfully in circumstances exposing him to risk of serious bodily injury[.]" 18 Pa.C.S. § 2902(a)(1). The crime of REAP is satisfied where a defendant "recklessly engages in conduct which places or may place another person in danger of death or serious bodily injury." 18 Pa.C.S.A. § 2705. Serious bodily injury is defined as "[b]odily injury which creates a substantial risk of death or which causes serious, permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." 18 Pa.C.S. § 2301.

"[T]o sustain a conviction under Section 2705, the Commonwealth must prove that the defendant had an actual present ability to inflict harm and not merely the apparent ability to do so. Danger, not merely the apprehension of danger, must be created." *Commonwealth v. Cordoba*, 902 A.2d 1280, 1288 (Pa. Super. 2006) (citing *Commonwealth v. Hopkins*, 747 A.2d 910, 915–16 (Pa. Super. 2000)). "[T]he mere fact that the victim only sustained minor injuries and did not sustain 'serious bodily injury' does not[,] *ipso facto* [,] establish that appellant's actions did not place others in danger of such injury [pursuant to a REAP charge]." *Commonwealth v. Geary*, 299 A.3d 896, at *2 (non-precedential decision) (Pa. Super. filed May

- 24 -

15, 2023) (quoting **Commonwealth v. Lawton**, 414 A.2d 658, 663 (Pa. Super. 1979). **See Commonwealth v. Shaffer**, 763 A.2d 411, 413-14 (Pa. Super. 2000) (holding evidence that defendant handcuffed victim, put her in car trunk, and drove with her in trunk exposed her to actual risk of serious bodily injury despite no use of weapons); **Commonwealth v. Bishop**, 307 A.3d 657, at **5 (non-precedential decision) (Pa. Super. 2024) (acknowledging unlawful restraint decisional law recognizing actual risk of serious bodily injury from evidence of impediment of ability to breathe or placement in dangerous location without need for additional evidence of threat of harm).

In the case *sub judice*, Appellant contends the Commonwealth failed to prove the element common between Unlawful Restraint and REAP, namely, placing G.M. at risk or in danger of serious bodily injury. He maintains that using duct tape to cover G.M.'s mouth and bind her hands behind her back before placing her in a wooden trunk and closing the lid did not put her in danger of death or serious bodily injury because holes in the side of the trunk allowed air to enter the box. In reviewing the jury's decision in its post-trial review, the trial court concluded that notwithstanding the presence of air holes, the verdict was within the weight of the evidence at trial and did not shock the conscience, as G.M. was placed at risk of suffocation and other serious bodily harm due to the duct tape on her face and the confining space within the trunk.

We discern no abuse of discretion in the trial court's determination that it was not shocking for the jury to conclude beyond a reasonable doubt that Appellant seriously imperiled young G.M. by compromising her ability to breathe when he stowed her in the trunk at the foot of his bed. Already under extraordinary stress from having been abducted by a stranger, G.M. was forced to cope with the terrifying ordeal of being shut inside a confining, dark space of a trunk while still bound and gagged with duct tape. It is beyond dispute that Appellant thus placed G.M. at risk of suffocation or serious physical injury as a manifestation of the these most taxing physical and emotional burdens. Accordingly, we deem Appellant's two related sufficiency and weight of the evidence claims as meritless.

In Appellant's next issue, he challenges the trial court's evidentiary ruling admitting, over defense objection, the Commonwealth's proffer of Appellant's interview statements and references in his journal that referred to "demons, used a runic/coded language, had a pentagram and discussed a hero's journey involving a female child as well as apocalyptic scenarios." Brief of Appellant at 48.[7]

Consistent with several pre-trial discussions on the evidentiary issue, the parties and the trial court addressed the matter one final time prior to the

---

[7] The jury also learned of a specific journal passage in which Appellant wrote, "if the heroic one is betrayed by the people who he serves, he will join the army of demons to end humanity, and if the blessed one is damaged in any way, then she will truly perish." N.T., 5/16/22, at 7.

Commonwealth's intention of introducing the evidence to accompany the testimony of a state trooper who was prepared to testify that she had interviewed Appellant when he quoted his journal passages that called upon a hero to save a child during demonic times, and had been to the residence of G.M. and saw the unsanitary living conditions to which she was exposed.

**DEFENSE COUNSEL:** Your Honor, our objection relating to the notebook was that the prejudice [outweighs] the probative value, and essentially there would be unfair prejudice as it would tend to inflame the jury against Mr. Dewald moreso than the relevance of what's in there.

There is significant information or statements in there that are primarily fantasy and dark fantasy of the demonic, stuff like that, that in and of itself would tend to cause a jury to essentially take that as a character issue and hold it against him for that, for the sole reason that that type of information is presented rather than any sort of relevance to whether he committed these acts.

**COMMONWEALTH:** . . . . Within the notebook, as the Court may at this time be aware, there is a reference to the end of times and that kind of talk, and to a hero taking a child because of the end of times. And then a couple lines down refers to this child as a female child.

And so, Your Honor, the Court is also aware of the statement that he gave to the State Police at the barracks at which time he mentions that he did this.

What I presume he will present to the jury, and what he will present to the jury through his statement, Your Honor, which I have not edited, is that he did this to save this little girl because of the conditions of her home.

So from the Commonwealth's perspective, Your Honor, the jury will hear him say why he did this. I presume that will be his defense in the case.

The Commonwealth, obviously, has evidence to the contrary to get into the mind of why he did what he did in actuality.

. . . .

**TRIAL COURT:** I read – I have read the journal. I have gone so far as to translate some of the runic descriptions or phrases that go along with the first couple of pages.

I would like to have the opportunity over the lunch hour to study it to pick out the descriptions of the heroic efforts, and I will make my decision and inform you after our break before Trooper Long takes the stand.

**DEFENSE COUNSEL:** Briefly, if I may add something, the packet that was provided, there are – to the extent that any of this does come in, the information contained in there is of differing relevance based upon what the Commonwealth has said.

For instance, what's a Pentagram needed for? What are the runics needed for, and the additional language needed for – the language that has no translation.

So, even assuming the Commonwealth is entitled to present some of this information about a hero's journey of saving a little girl and whether it's relevant to what Mr. Dewald's motive is, that doesn't mean all of the information contained in here is.

**THE COURT:** What about, Attorney Fogal, what about we could obscure the runic language and the written language from the Roman Alphabet that doesn't, you know, it's not English, those parts of it, and we can leave the things that anybody would be able to read?

N.T., 5/17/22, at 105-108.

Admission of evidence is within the sound discretion of the trial court. ***Commonwealth v. Collins***, 888 A.2d 564, 577 (Pa. 2005). "All relevant evidence is admissible, except as otherwise provided by law. Evidence that is not relevant is not admissible." Pa. R.E. 402, Relevant evidence is defined as evidence that "has any tendency to make a fact more or less probable than it would be without the evidence ... and ... the fact is of consequence in determining the action." Pa.R.E, 401. In addition, "[t]he court may exclude relevant evidence if its probative value is outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Pa.R.E. 403. Thus, Rule 403 vests the trial court with authority to determine the admissibility of the evidence with an eye towards "clear, concise, and expeditious presentation, allowing for the exclusion of evidence

- 29 -

that is confusing, cumulative, or unfairly prejudicial." ***Farese v. Robinson***, 222 A.3d 1173, 1186 (Pa. Super. 2019).

Initially, we note that the Brief of Appellant fails to develop its argument on this issue beyond setting forth the general standard of review for a Rule 403 issue and noting that he preserved the issue with an objection to the admission of Appellant's statements and journal entries. Absent from the argument is any discussion, supported by authority, regarding whether the evidence was relevant and, if so, why its probative value was outweighed by a danger of unfair prejudice. Instead, Appellant dedicates half of his one-page argument to baldly protesting against the trial court's apparent agreement with the Commonwealth's anticipation of a defense claiming that Appellant sought to rescue G.M. despite the fact, he asserts, that he had not declared any such defense beforehand.

The record shows the trial court admitted the contested evidence after it agreed with the Commonwealth's Rule 403(b) argument that any unfair prejudice attendant to its admission was outweighed by its probative value in providing important, explanatory context to the similar statements Appellant made during his post-arrest interrogation that he was rescuing the children he either had kidnapped or attempted to kidnap. It was also the Commonwealth's argument during pretrial motions that the evidence was additionally probative to dispel any potential defense that Appellant committed his acts not with reckless or knowing disregard for potential harm but to rescue children from what he considered to be unsafe households. N.T.,

- 30 -

5/17/22, at 105. Indeed, this was a defense advanced by Appellant at trial. Whether or not Appellant indicated pretrial that it intended to raise such a defense, we discern no reversible error with the trial court's ruling to admit relevant, corroborative evidence having a probative value with respect to its prosecutorial theory that outweighed any danger of unfair prejudice.

Next, we address Appellant's claim that the trial court erred in denying his pretrial request for a change of venue because of concern that pretrial publicity would deny him a fair trial in Franklin County. A motion for change of venue or venire "may be" granted "when it is determined after hearing that a fair and impartial trial cannot ... otherwise be had in the county where the case is currently pending." Pa.R.Crim.P. 584(A). On the question of whether pretrial publicity warrants a change of venue, this Court has observed the following Pennsylvania Supreme Court jurisprudence:

> The mere existence of pretrial publicity does not warrant a change of venue. Ordinarily, a defendant is not entitled to a change of venue unless he or she can demonstrate that the pretrial publicity resulted in actual prejudice that prevented the impaneling of an impartial jury. Prejudice will be presumed, however, if the defendant is able to show that the pretrial publicity: (1) was sensational, inflammatory, and slanted toward conviction, rather than factual and objective; (2) revealed the defendant's prior criminal record, if any, or referred to confessions, admissions or reenactments of the crime by the defendant; or (3) derived from official police or prosecutorial reports. Even if the defendant proves the existence of one or more of these circumstances, a change of venue is not warranted unless the defendant also demonstrates that the pretrial publicity was so extensive, sustained, and pervasive that the community must be deemed to

- 31 -

have been saturated with it, and that there was insufficient time between the publicity and the trial for any prejudice to have dissipated.

***Commonwealth v. Tharp***, 830 A.2d 519, 529 (Pa. 2003) (citations omitted).

. . .

In testing whether there has been a sufficient cooling period, a court must investigate what a panel of prospective jurors has said about its exposure to the publicity in question. This is one indication of whether the cooling period has been sufficient. Thus, in determining the efficacy of the cooling period, a court will consider the direct effects of publicity, something a defendant need not allege or prove. Although it is conceivable that pre-trial publicity could be so extremely damaging that a court might order a change of venue no matter what the prospective jurors said about their ability to hear the case fairly and without bias, that would be a most unusual case. Normally, what prospective jurors tell us about their ability to be impartial will be a reliable guide to whether the publicity is still so fresh in their minds that it has removed their ability to be objective. The discretion of the trial judge is given wide latitude in this area.

***Commonwealth v. Chambers***, 685 A.2d 96, 104 (Pa. 1996) [].

***Commonwealth v. Kratz***, 253 A.3d 329 (non-precedential decision) (Pa. Super. Ct. filed April 30, 2021).

Appellant filed a motion for change of venue citing the widespread media coverage of the kidnapping of and ensuing search for G.M., and the manhunt for Appellant that followed. He posits that "significant and pervasive reporting from local and national media sources that dominated the links for the first 10 pages of a google search[,]" exempts him from the general rule requiring

proof of actual prejudice in the empaneling of the jury, as actual prejudice is presumed whenever a defendant demonstrates that the pretrial publicity: (1) was sensational, inflammatory, and slanted toward conviction, rather than factual an objective; (2) revealed the defendant's prior criminal record, if any, or referred to confessions, admissions or reenactments of the crime by the defendant; or (3) derived from official police or prosecutorial reports. *Id.* at 219.

Nevertheless, Appellant acknowledges he must also demonstrate to this Court that the community within Franklin County must be deemed to have been saturated with presumptively prejudicial pretrial publicity and that there was insufficient time between the publicity and the trial for any prejudice to have dissipated. *Commonwealth v. Briggs*, 12 A.3d 291, 314 (Pa. 2011).

In response, the trial court responds that it chose to defer disposition on Appellant's pretrial motion until it "had the opportunity to conduct *voir dire* and ascertain whether or not a jury pool could comprise sufficient individuals who had not had a fixed opinion about [Appellant] or some other bias that would prevent them from being fair or impartial jurors at trial." Trial Court Pa.R.A.P. 1925 Opinion, 3/13/23, at 17. The trial court explains *voir dire* revealed between 20 and 30 members of a pool of 101 prospective jurors "had recalled some of the publicity that this case had received in the late spring and summer of 2019. Of those 20 to 30, only five or six indicated they could not be fair based on pretrial publicity. *Id*.

Governed by the standards set forth *supra*, we observe that even if we assume *arguendo* a community saturation of pretrial publicity occurring in the several weeks of G.M.'s 2019 disappearance and discovery and the arrest of Appellant immediately afterward, Appellant has not established that an inadequate cooling off period occurred prior to *voir dire*. Indeed, the trial court's uncontested description of *voir dire* was that only 20 or 30 jurors of over 100 recalled seeing the story on the news, and of that number, only five or six indicated an inability to be impartial because of the pretrial publicity. Our decisional law instructs that what prospective jurors tell the trial court about their ability to be impartial is a reliable guide for the court, whose ultimate exercise of discretion after gaining such information from *voir dire* receives great deference. On the record before this Court, we deny Appellant's issue as devoid of merit.

Next, Appellant argues that the trial court erred in imposing the sentences for the crimes of unlawful restraint and false imprisonment, consecutively to his sentence for kidnapping when, he claims, they both merge with kidnapping for sentencing purposes. A claim that two crimes should have merged for sentencing purposes implicates the legality of the sentence. **Commonwealth v. Brown**, 159 A.3d 531, 532 (Pa. Super. 2017). Our standard of review for a challenge to the legality of a sentence is *de novo*, and our scope of review is plenary. **Id.**

Pennsylvania's merger doctrine is codified in section 9765:

> No crimes shall merge for sentencing purposes unless the crimes arise from a single criminal act and all of the statutory elements of one offense are included in the statutory elements of the other offense. Where crimes merge for sentencing purposes, the court may sentence the defendant only on the higher graded offense.

42 Pa.C.S. § 9765. It is well-settled that Section 9765 prohibits merger unless two distinct facts are present: 1) the crimes arise from a single criminal act; and 2) all of the statutory elements of one of the offenses are included in the statutory elements of the other. **Commonwealth v. Baldwin**, 985 A.2d 830, 833 (Pa. 2009).

> When considering whether there is a single criminal act or multiple criminal acts, the question is not "whether there was a 'break in the chain' of criminal activity." The issue is whether "the actor commits multiple criminal acts beyond that which is necessary to establish the bare elements of the additional crime, then the actor will be guilty of multiple crimes which do not merge for sentencing purposes."

**Commonwealth v. Martinez**, 153 A.3d 1025, 1030 (Pa. Super. 2016), *quoting* **Commonwealth v. Pettersen**, 49 A.3d 903, 912 (Pa. Super. 2012). "In determining whether two or more convictions arose from a single criminal act for purposes of sentencing, we must examine the charging documents filed by the Commonwealth." **Id.** at 1031 (citing **Commonwealth v. Jenkins**, 96 A.3d 1055, 1060 (Pa. Super. 2014)).

Appellant was charged with, and convicted of, *inter alia*, unlawful restraint, false imprisonment, and kidnapping. The Kidnapping charge against Appellant stated:

> In that, on or about said date, the Defendant did unlawfully remove another, namely GM, a substantial distance under the circumstances from the place [] where she was found and , or did

- 35 -

unlawfully confine another, namely GM, for a substantial period in a place of isolation, with intent to inflict bodily injury on or to terrorize the victim or another, that is to say The Defendant did take GM from her bedroom in the middle of the night by carrying her from the second floor of her residence . . . and transported her to his residence . . . where he kept her until 0630 hrs., taped her up and put her in a wooden chest.

Criminal Complaint, 04/30/19, at Count 1.

With respect to False Imprisonment of Minor, Appellant was charged with:

In that, on or about said date, the Defendant knowingly restrains another unlawfully so as to interfere substantially with her liberty, taped GM's wrists, ankles and mouth while at the residence of [Appellant], did prevent from moving by taping her wrists, ankles, and mouth while placing her in a Wooden Chest preventing her from moving, walking and talking, which constituted a substantial step toward the commission of said crime, in violation of Section 901(a) of the PA Crimes Code.

Criminal Complaint, 04/30/19, at Count 7.

With respect to Unlawful Restraint, Appellant was charged with:

In that, on or about said date, the Defendant did knowingly and unlawfully restrain another person, namely GM, in circumstances exposing the said other person to risk of serious bodily injury, in violation of Section 2902(a)(1) of the PA Crimes Code.

Criminal Complaint, 04/30/19, at Count 8.

In its 1925(a) opinion, the trial court reasons that Appellant's crimes did not merge because they did not arise from a single criminal act. Whereas the Criminal Complaint and the evidence adduced at trial described the kidnapping of G.M. as the removal of the child from her home to Appellant's residence, the false imprisonment and unlawful restraint were described in the same

charging document and at trial as acts of restraint committed exclusively in Appellant's residence.

As the trial court recounted in its 1925(a) opinion, although the kidnapping, restraint, and imprisonment of G.M. occurred during a continuous timeline, they are separate criminal acts:

> At trial, G.M. testified that after Appellant took her to his house, he taped her hands, feet, mouth and nose and put her into a box. N.T. 5/17/2022, at pp. 32-35. It hurt her to be in the box because she could hardly breathe. N.T. at p. 32. [Appellant's] interview with PSP comported with G.M.'s testimony on this point. Commonwealth's Exhibit 569. Therefore, the kidnapping was the removal of G.M. from her house to [Appellant's residence at his] grandparents' house, while the false imprisonment and unlawful restraint were the [Appellant's] acts of taping G.M.'s hands and feet and face and placing her in the box, which both interfered with her liberty and exposed her to a risk of bodily injury. Accordingly, the kidnapping of G.M. by [Appellant] and her imprisonment and restraint by [Appellant] are separate criminal act and therefore should not merge under 42 Pa.C.S. § 9765.

Trial Court Opinion, at 7.

We concur with the trial court's reasoning that rejects Appellant's first merger issue, as the criminal complaint alleged and the Commonwealth's evidence established that Appellant's kidnapping of G.M. facilitated the removal of G.M. from her home to Appellant's residence, while the ensuing unlawful restraint and false imprisonment together comprised the binding and muffling of G.M. with duct tape and placement of her in a small wooden trunk in Appellant's bedroom. Accordingly, Appellant committed multiple, distinct criminal acts in this sequence such that he may not satisfy the first requirement for merger under Section 9765.

Appellant's second merger issue, assailing the trial court's determination that his sentence for REAP did not merge into the sentence for Unlawful Restraint, suffers a similar fate. Although the offenses each arose from the same single act of binding G.M. and confining her in a trunk, they each have an element that the other does not, such that it is possible to commit one without committing the other. This Court has recognized governing Pennsylvania Supreme Court jurisprudence to this effect:

> In **Commonwealth v. Edwards**, 256 A.3d 1130 (Pa. 2021), our Supreme Court explained that merger requires an analysis of the elements of the statute without regard to the specific facts at issue in the case. **See id.** at 1137-38. There, the Court held that aggravated assault and recklessly endangering another person (REAP) did not merge, even when arising out of a single act, when not all statutory alternatives for the former crime were subsumed by the elements of the latter. **Id.** at 1139. The crime of aggravated assault under subsection 2702(a)(1) prohibited both *actually* causing serious bodily injury and *attempting* to cause serious bodily injury, while REAP required a showing of actual danger of death or serious bodily injury. **Id.** at 1135. The defendant was convicted for a single act of actually inflicting serious bodily injury on the victim. Nevertheless, our Supreme Court held that the charges did not merge for sentencing purposes because it is possible to attempt to put someone in danger of serious bodily injury under subsection 2702(a)(1) without actually doing so under the REAP statute. **Id.** at 1138 (citing **Commonwealth v. Cianci**, 130 A.3d 780, 782 (Pa. Super. 2015)).

**Commonwealth v. Rosario**, 301 A.3d 918 (Pa. Super. 2023), *reargument denied* (Aug. 29, 2023), *appeal denied,* No. 237 WAL 2023, 2024 WL 701324 (Pa. Feb. 21, 2024)

Pursuant to 18 Pa.C.S. § 2705, REAP, "A person commits a misdemeanor of the second degree if he recklessly engages in conduct which

places or may place another person in danger of death or serious bodily injury." Meanwhile, 18 Pa.C.S. § 2902(b), Unlawful Restraint of a minor where offender is not victim's parent, provides in relevant part, "If the victim is a person under 18 years of age, a person who is not the victim's parent commits a felony of the second degree if he knowingly: (1) restrains another unlawfully in circumstances exposing him to risk of serious bodily injury[.]

Therefore, REAP's element of "any conduct" is not entirely subsumed within Unlawful Restraint's proscription of "restraining" someone, and Unlawful Restraint's heightened *mens rea* requirement of acting knowingly is not subsumed in REAP's *mens rea* of recklessness. Accordingly, under **Edwards**, they do not merge for sentencing.

For the foregoing reasons, we affirm Appellant's judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 05/30/2024

- 39 -